IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ARROWPOINT CAPITAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-161-GMS |
| | ) | |
| ARROWPOINT ASSET MANAGEMENT, | ) | |
| LLC; ARROWPOINT PARTNERS GP, LLC; | ) | |
| ARROWPOINT PARTNERS GP2, LLC; | ) | |
| ARROWPOINT FUNDAMENTAL | ) | |
| OPPORTUNITY FUND, LP; and | ) | |
| ARROWPOINT STRUCTURED | ) | |
| OPPORTUNITY FUND, LP, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

## I. INTRODUCTION

On February 26, 2010, Arrowpoint Capital Corp. ("the plaintiff") filed a complaint against Arrowpoint Asset Management, LLC ("AAM"), Arrowpoint Partners GP, LLC, Arrowpoint Partners GP2, LLC, Arrowpoint Fundamental Opportunity Fund, LP, and Arrowpoint Structured Opportunity Fund, LP (collectively, "the defendants"). (D.I. 1.) The plaintiff alleges that the defendants' uses of the "Arrowpoint" name and the logo (the "AAM Logo") in connection with investment-related products and services constitute trademark infringement under the common law and Section 32 of the Lanham Act, 15 U.S.C. § 1114, and unfair competition and false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Delaware Deceptive Trade Practices Act ("DTPA"), 6 Del. C. §§ 2531, *et seq.* (2009). (*Id.*) Presently before the court is the plaintiff's motion for a preliminary

and permanent injunction to enjoin the defendants from using the AAM Logo, the "Arrowpoint" element in their names, and any other name or logo similar to the plaintiff's trademarks[1] in connection with investment related products and services. (D.I. 4.) For the reasons discussed below, the plaintiff fails to establish a fundamental requirement for injunctive relief. Therefore, the court denies the plaintiff's motion.

## II.    BACKGROUND

The plaintiff is a holding corporation organized under the laws of Delaware. (D.I. 1, ¶¶ 1, 2.) The plaintiff's subsidiaries Arrowood Indemnity Company and Arrowood Surplus Lines Insurance Company (collectively, "Arrowood") "provide insurance and investment-related financial services for customers throughout the United States" under the trade name "Arrowpoint Capital." (*Id.*, ¶ 2.) In 2007, the plaintiff acquired the United States insurance operations of Royal Sun Alliance and Storage Group plc ("Royal") and began managing the run-off of Royal's United States policies. (*Id.*, ¶ 3.) As part of that business, the plaintiff asserts that it "manage[s] assets derived from policy premiums." (*Id.*) The plaintiff claims that its "primary source of income is the investment of its reserves in fixed-income securities,"[2] which enables it "to pay its operating costs and meet its financial obligations to policyholders." (D.I. 48 at 1.) The plaintiff also purports to have "provided investment management services to an unaffiliated insurer from March 4, 2007, until October 15, 2009," and marketed its investment management services to

---

[1] More accurately, the plaintiff owns two federally registered service marks. The Lanham Act provides nearly identical definitions for the two terms, except a trademark is used to "identify and distinguish . . . goods," whereas a service mark performs the same function for "services." *See* 15 U.S.C. § 1127. The Lanham Act "generally applies the same principles concerning ... protection to both trade and service marks." *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1064 n.2 (3d Cir. 1991) (citing 15 U.S.C. § 1053). Although this is a service mark case, for ease of reference, the court will use the term "trademark" or "mark" in its opinion.

[2] According to the plaintiff, when "insurance operations are in run-off, [the insurance company] no longer collects premiums from its policyholders." (D.I. 48 at 1 n.2.)

2

other insurers and pension funds.[3]  (*Id.* at 1-2; *see also* D.I. 1, ¶ 3.)

The defendants consist of limited liability companies and limited partnerships organized under the laws of Delaware that have their principal places of business in Denver, Colorado. (*Id.*, ¶¶ 4-8.)  The defendants' entities were formed between December 2007 and April 2009. (*Id.*)  The defendants provide investment-related services including individual investment management accounts and three separate private investment funds, commonly referred to as "hedge funds." (D.I. 58 at 3.)  They manage over $1.5 billion in assets and their customer base consists of "high net worth individuals, companies operating primarily for the benefit of wealthy individuals, family foundations, or trusts." (*Id.* at 2.)

In August 2008, the plaintiff obtained federal registrations from the U.S. Patent and Trademark Office (the "PTO") for the word mark ARROWPOINT CAPITAL and design mark **Arrowpoint Capital** ("AC Logo") (collectively, "Arrowpoint Marks") in International Classification ("I.C.") 36 "in connection with insurance-related products and services."[4]  (D.I. 1, ¶¶ 16-17.)  Both registrations were based on use in interstate commerce since March 4, 2007. (*Id.*)  In September 2009, after learning of the alleged defendants' infringement, the plaintiff filed an application to register the word mark ARROWPOINT CAPITAL in I.C. 36 for

---

[3] The court notes that the parties materially dispute whether the alleged "unaffiliated insurer" is actually not affiliated with the plaintiff. (*See* D.I. 58 at 10; D.I. 73 at 5.)

[4] The plaintiff filed the applications on January 14, 2008, and the registration numbers were issued on August 12, 2008. The Certificates of Registration specify that the AC Logo and ARROWPOINT CAPITAL word mark are registered for: "writing property casualty insurance; underwriting in the fields of property and casualty insurance; insurance claims processing; insurance claims servicing, namely claims administration and premium rate computing; actuarial services; and insurance consulting services, in Class 36." (D.I. 1, Ex. A.)  According to the PTO, "Class 36 includes mainly services rendered in financial and monetary affairs and services rendered in relation to insurance contracts of all kinds." U.S. Patent and Trademark Office, Nice Agreement Tenth Edition - General Remarks, Class Headings and Explanatory Notes - Version 2012, *available at* http://www.uspto.gov/trademarks/notices/international.jsp (last visited May 5, 2014).

3

"investment management services."[5]  (*Id.*, ¶ 23; D.I. 48 at 2.)  AAM opposed that application, and the proceedings before the Trademark Trial and Appeal Board are currently suspended pending the conclusion of the present litigation. (D.I. 58 at 8.)

The defendants first used word marks containing the ARROWPOINT element in December 2007[6] and adopted the AAM Log in January 2009. (*Id.* at 3.)  The defendants state that they "selected its marks after a clearance procedure that included counsel's review of a full U.S. availability trademark search report." (*Id.*)  In June 2008, the defendants filed a statement of trade name with the Colorado Secretary of State, which indicated that they intended to transact business under the trade name "Arrowpoint Partners." (D.I. 5 at 4.)  In or about February 2008, the defendants began promoting the recognition of their word mark through websites using domain names that include the ARROWPOINT element.[7]  (*Id.*)

## III.   STANDARD OF REVIEW

"The decision to grant or deny . . . injunctive relief is an act of equitable discretion by the district court." *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3d Cir. 1994)).  The moving party seeking a preliminary injunction must establish (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) the balance of equities tips in the moving party's favor; and (4) an injunction is in the public interest. *Winter v.*

---

[5]   The court notes that the plaintiff's intent-to-use application does not establish priority against those already using the mark, nor does it reserve an enforceable right in a mark. *See Lucent Information Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 313-14 n. 3 (3d Cir. 1999).

[6]   *E.g.*, Arrowpoint Asset Management and Arrowpoint Partners.

[7]   *E.g.*, www.arrowpointassetmanagement.com and www.arrowpointpartners.com.

*NDRC, Inc.*, 555 U.S. 7, 20 (2008). The issuance of a preliminary injunction is only appropriate when the moving party produces sufficient evidence to establish every element in its favor. *See P.C. Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore, LLC,* 428 F.3d 504, 508 (3d Cir. 2005). "If either or both of the fundamental requirements - likelihood of success on the merits and probability of irreparable harm if relief is not granted - are absent, an injunction cannot issue." *Capriotti's Sandwich Shop, Inc. v. Taylor Family Holdings, Inc.*, 857 F. Supp. 2d 489, 499 (D. Del. 2012) (*citing McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 523 (3d Cir. 1994)).

## IV.   DISCUSSION

The plaintiff argues that it has established rights in its Arrowpoint Marks through valid federal registrations and continuous use in interstate commerce dating back to March 2007, and that its registrations for insurance-related services protects it from the defendants' infringement because investment management is a "fundamental aspect of insurance." (D.I. 73 at 2-3.) As such, it alleges the defendants' unauthorized use of the AAM Logo and Arrowpoint element in connection with the same type of services has caused actual confusion and irreparable harm for which there is no adequate remedy at law. (D.I 48 at 10.) Therefore, the plaintiff argues it is entitled to a preliminary injunction based on: (1) its trademark infringement claims under the Section 32 of the Lanham Act,[8] Delaware common law, and the DTPA; and (2) unfair

---

[8] Section 32 of the Lanham Act provides:
  Any person who shall, without consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . .
15 U.S.C. §1114(1)(a).

competition and false advertising claims under Section 43(a) of the Lanham Act[9] and the DTPA. (D.I. 5; D.I. 48.) In response, the defendants argue that the plaintiff's trademark registrations for insurance-related services do not give it the right to block the defendants from using their marks for the distinctly different business of investment management services. (D.I. 58 at 9.) In addition, the defendants contend that the plaintiff does not provide investment management services to any *bona fide* third parties, and only manages investments of insurance premiums and other funds for itself and affiliated insurers. (*Id.* at 5-6.)

### A.   Likelihood of Success on the Merits - Trademark infringement and unfair competition under the Lanham Act

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Freedom Card, Inc. v. J.P. Morgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005) (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994)). A plaintiff establishes trademark infringement and unfair competition under the Lanham Act by proving that: "(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark is likely to create confusion concerning the origin of the goods or services." *Id.* (quoting *A&H*

---

[9] While the plaintiff alleges both unfair competition and false advertising under section 43(a) of the Lanham Act, it only briefed and referenced statutory language related to unfair competition. Under section 43(a) of the Lanham Act, unfair competition is codified by 15 U.S.C. § 1125(a)(1)(A), while false advertising is codified by 15 U.S.C. § 1125(a)(1)(B). Accordingly, the court will only address the unfair competition part of section 43(a):

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

6

*Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 202 (3d Cir. 1999)).

## 1. Validity, protectability, and ownership

Federal registration of a mark is *prima facie* evidence of validity, protectability, and ownership. *See* 15 U.S.C. §§ 1057(b). However, the presumption of validity only extends to "the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate." *Id.*; *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1396 (3d Cir. 1985) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir. 1978) ("[E]ven if a mark is registered, the presumptive right to use it extends only so far as the goods or services noted in the registration certificate."). "If the [registered] mark . . . has not achieved incontestability,[10] then 'validity depends on proof of secondary meaning, unless the . . . contestable mark is inherently distinctive.'" *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000)* (quoting *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 292 (3d Cir. 1991)). "A mark is inherently distinctive if it may be fairly characterized as arbitrary, fanciful, or suggestive." *Id.* at 438 n.5.

Here, the defendants argue that the plaintiff cannot establish the first two elements for trademark infringement under the Lanham Act because insurance and investment management services are "two distinctly different businesses." (D.I. 58 at 9.) The court disagrees. The plaintiff's Arrowpoint Marks were federally registered on August 12, 2008. (D.I. 1, Ex. A.) Both certificates of registration expressly state that the marks are "for: writing property casualty

---

[10] "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons*, 30 F.3d at 472 n.7; 15 U.S.C. §§ 1058, 1065. Incontestability is not at issue in this case. The Arrowpoint Marks were first used in commerce in March 2007 and the present litigation was initiated less than three years later in February 2010.

insurance; underwriting in the fields of property and casualty insurance; insurance claims processing; insurance claims servicing, namely, claims administration and premium rate computing; actuarial services; and insurance consulting services." (D.I. 1, Ex. A.) As such, the plaintiff's certificates of registration specify purely insurance-related services, and are devoid of any indication that the Arrowpoint Marks are used for investment management services. Thus, the plaintiff's Arrowpoint Marks do not carry a presumption of validity in the area of investment management services. Nonetheless, the plaintiff argues, and the defendants do not dispute, that the Arrowpoint Marks are inherently distinctive. (*See* D.I. 48 at 13 ("Arrowpoint Marks are arbitrary"); D.I. 58 at 12 ("ARROWPOINT is suggestive").) Therefore, the court finds that the plaintiff owns valid marks, which are legally protectable against the defendants' alleged infringement if a likelihood of confusion exists between the parties' marks. *See Interpace Cord v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983) (finding the use of mark "Lapp" on wire and cable infringed on the plaintiff's rights to that mark as applied to ceramic insulators); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1255, 1228 (3d Cir. 1978) (finding the use of name "Scott" on household cleaners did not infringe the use of that mark on paper products).

### 2.     Likelihood of confusion

"To prove likelihood of confusion, plaintiffs must show that 'consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Checkpoint Sys. v. Check Point Software Tech.*, 269 F.3d 270, 279 (3d Cir. 2001) (quoting *Scott Paper*, 589 F.2d at 1229). The Third Circuit has adopted a ten-factor test, known as the "*Lapp* test," to determine likelihood of confusion in the market for both competing and noncompeting goods. *Victoria's Secret*, 237 F.3d at 215. The factors are:

8

(1) the degree of similarity between the owner's mark and the alleged infringing mark;
(2) the strength of the owner's mark;
(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
(4) the length of time the defendant has used the mark without evidence of actual confusion arising;
(5) the intent of the defendant in adopting the mark;
(6) the evidence of actual confusion;
(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
(8) the extent to which the targets of the parties' sales efforts are the same;
(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;
(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Id.* No single factor is determinative in the likelihood of confusion analysis, and each factor must be weighed and balanced against one another. *Checkpoint*, 269 F.3d at 280. Further, "the Lapp test is a qualitative inquiry . . . [and] the different factors may properly be accorded different weights depending on the particular factual setting." *Victoria's Secret*, 237 F.3d at 215.

Here, the plaintiff argues that the defendants' use of the "Arrowpoint" element in their names "has caused repeated instances of actual confusion among even the most sophisticated financial institutions and is likely to cause additional confusion among customers." (D.I. 48 at 10.) In essence, the plaintiff contends that brokerage personnel who handle fixed-income securities transactions "have been misled into mistaking one entity for the other or into believing that the entities are in some way affiliated or related." (*Id.* at 14.) The defendants vehemently dispute that any confusion exists and contend that "the high level of consumer sophistication [in

9

this case] obviates any link between the alleged supplier confusion and any potential or actual effect on a consumer's purchasing decision."[11]  (D.I. 58 at 15.)

The parties focus their likelihood of confusion arguments on the respective ARROWPOINT word marks and do not put forth any significant arguments regarding the logos. Nevertheless, the court will address logos in addition to the word marks.  Additionally, because the evidence of actual confusion is integral to many of the parties' arguments, the court will address the *Lapp* factors in a modified sequence.[12]

### a.  Degree of similarity between the marks

Marks are confusingly similar "if ordinary consumers would likely conclude that [the services] share a common source, affiliation, connection or sponsorship."  *Fisons*, 30 F.3d at 477.  The proper legal test for mark similarity is "whether the [marks] create the same overall impression when viewed separately."  *Fisons,* 30 F.3d at 477.  "Overall impression is created by the sight, sound, and meaning of the mark."  *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010).  When comparing the marks, each should be viewed in their entirety, giving greater force and effect to the dominant feature.  *Country Floors, Inc. v. P'ship Composed of Gepner and Ford*, 930 F.2d 1056, 1065 (3d Cir. 1991).

As a starting point, the parties' logos -- Arrowpoint CAPITAL and   /A\   -- are not confusingly similar because they do not create the same overall impression.  *Fisons,* 30

---

[11] The defendants argue that "[t]he primary focus of the Lanham Act is consumer confusion" and "trademark laws protect only against confused purchasing decisions, not against confusion generally." (D.I. 58 at 15.)  The court disagrees.  Under established Third Circuit law, the Act covers "the use of trademarks which are likely to cause confusion, mistake, or deception *of any kind*, not merely of purchasers nor simply as to source of origin."  *Kos Pharm.,* 369 F.3d at 711.  Accordingly, the court must analyze all incidents of confusion related to the parties' marks.

[12] The parties agree *Lapp* factor 10 – facts suggesting the public might expect the plaintiff to expand and offer services in the defendants' market -- is neutral because it does not apply in this case.

F.3d at 477. Indeed, the similarity is negligible. Both logos contain a chevron reminiscent of an arrowhead, and a horizontal line. However, the AC Logo chevron is small in relation to the overall size of the mark, and its use in place of the letter "A" as part of the logo's dominant feature -- the phrase "Arrowpoint Capital." In contrast, the AAM Logo uses a large chevron surrounded by parallel lines to create its dominant feature, which is prominently placed in the center of the mark. Further, the full-color versions of the logos are even more distinct. The AC Logo is dominated by blue lettering and has a thin red accent line. On the other hand, the AAM Logo contains four distinct colors, and its use of color draws the viewer's eye to the center of the mark. In sum, the parties' logos are unlikely to be confused because they do not "create the same overall impression when viewed separately." *Fisons*, 30 F.3d at 477.

However, the word marks are much more similar. "Arrowpoint" is the dominant feature and it appears as the first word in all of the marks.[13] The defendants' additional terms "asset management," "partners," "fundamental opportunity fund," and "structured opportunity fund" do change the overall visual impact and sound of the marks, but convey a meaning somewhat similar to "capital." *See Checkpoint.*, 269 F.3d at 281-82 (finding Check Point Software "very similar" to Checkpoint Systems because "Software" and "Systems" are "generic or descriptive terms . . . [that] would not lead the average consumer to disassociate the products.").[14] But courts in this circuit have found that very similar marks are able to coexist in the financial services market, where consumers take greater care than many others, when the parties use their

---

[13] *See* Arrowpoint Capital as compared to Arrowpoint Asset Management, Arrowpoint Partners, Arrowpoint Fundamental Opportunity Fund, and Arrowpoint Structured Opportunity Fund.

[14] *See also* J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition, § 23:50 (4th ed. 2000) ("The Trademark Board has said that the general rule is that a subsequent user may not avoid likely confusion by appropriating another's entire mark and adding descriptive or non-distinctive matter to it." An exception to that rule exists when "the marks in their entireties convey quite different meanings.").

full names in "official" communications. *See First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*, 923 F. Supp. 693, 704 (E.D. Pa. 1996); *Sav. Bank Life Ins. Co. of Mass. v. SBLI USA Mut. Life Ins. Co.*, C.A. No. 00-3255, 2000 U.S. Dist. LEXIS 17178, at *49 (E.D. Pa., Nov. 29, 2000).[15]   Accordingly, the court finds that the word marks are similar, but the dominant "Arrowpoint" feature is tempered when the marks are viewed in their entirety.   Therefore, with respect to the word marks, this factor slightly favors the plaintiff.

### b.    Strength of the owner's mark

"To determine the strength of the mark, courts look to (1) the inherent features of the mark contributing to its distinctiveness or conceptual strength and (2) the factual evidence of the mark's commercial strength or of marketplace recognition of the mark." *Sabinsa*, 609 F.3d at 184-85 (citing *Victoria's Secret*, 237 F.3d at 221).

For conceptual strength, the court agrees with the defendants that the Arrowpoint Marks are "suggestive, indicating direction and precision."[16]   (D.I. 58 at 12.)   However, the marks conceptual strength is undermined by the lack of evidence demonstrating commercial strength. The plaintiff's solitary support for commercial strength is that it has spent approximately $390,000 promoting its marks. (D.I. 73 at 8.)   The court is unable to gauge whether that sum spent on promotional efforts is sufficient to establish marketplace recognition for investment management services.   By way of comparison, the defendants claim to have spent almost double

---

[15] *See also Omicron Capital, LLC. v. Omicron Capital, LLC*, 433 F. Supp. 2d 382,391 (S.D.N.Y. 2006) (finding identical word marks for financial services unlikely to cause confusion because they are not broadly marketed to the public, and "prospective purchasers are unlikely to perceive the marks before becoming familiar with the parties' businesses.").

[16] *See Sabinsa*, 609 F.3d at 185 (citation and internal quotation marks omitted) ("Arbitrary or fanciful marks [like Kodak] use terms that neither describe nor suggest anything about the product. Suggestive marks [like Coppertone] require consumer imagination, thought, or perception to determine what the product is.").

that amount -- $736,000 -- for the same purpose.[17] (D.I. 58 at 5.) Accordingly, the court is not

convinced that the Arrowpoint Marks have obtained any significant commercial strength, which

weakens the overall strength of the mark. Therefore, the court finds that the factor is neutral.

### c. Evidence of actual confusion

"Evidence of actual confusion is . . . highly probative of a likelihood of confusion."

*Sabinsa*, 609 F.3d at 187. However, a court may discount evidence of actual confusion that is

"isolated and idiosyncratic." *Victoria's Secret*, 237 F.3d at 227. Further, "[c]onfusion is not

actionable where it is not shown . . . [to have] resulted from confusion between the two

companies as opposed to mere carelessness or accident." *First Keystone*, 923 F. Supp. at 706.

Here, the plaintiff produced no evidence of actual customer confusion. Instead, it argues

that "broker dealers at global financial institutions, including Bank of America, Barclays,

Citigroup, RBS, and Morgan Stanley, all have been misled into mistaking one entity for the other

or into believing that the entities are in some way affiliated or r elated." (D.I. 48 at 14.)

Specifically, the plaintiff provides three categories of alleged actual confusion: 1) third-party

inquiries about the relationship between the parties;[18] 2) misdirected trades;[19] and 3) incidents of

---

[17] The court notes that the defendants' purported marketing expenditures may be "highly inflated" and include the defendants founder's travel expenses "for any purpose." (*See* D.I. 73 at 8 n.14.)

[18] For example, in April 2009, a Royal Bank of Scotland ("RBS") salesperson contacted the plaintiff regarding a large security purchase that the defendants had made using a different broker, and asked why the plaintiff had not engaged RBS for the transaction; in May 2009, an attorney for Barclays Capital negotiating a security agreement for the plaintiff asked whether it was "a different entity from the arrowpoint that is being represented by [a different law firm]"; and in April 2010, in connection with a securities agreement, Citigroup sent a request for general information regarding the plaintiff, and asked it to do the same exercise for two of the defendants entities – Arrowpoint Fundamental Opportunity Fund and Arrowpoint Structured Opportunity Fund. (D.I. 48 at 6-8.)

[19] On three occasions between April and July 2009, JPMorgan Chase & Co. ("JPMorgan") misallocated the defendants' trades to the plaintiff's brokerage account. (D.I. 48 at 6-7.) However, the plaintiff rejected each trade before settlement. In addition, the plaintiff's representative testified that misallocated trades are not uncommon in the financial services industry. (D.I. 58 at 15 n.6.)

mistaken identity, which inhibited the plaintiff's ability to complete trades.[20]   (D.I. 48 at 6-8.)

The court views many of the alleged inquiries about the affiliation between the parties "with great skepticism, given the interested sources and the inability to cross-examine the supposedly confused individuals." *Victoria's Secret*, 237 F.3d at 227.   In addition, the court has not been presented sufficient evidence to determine whether the misdirected trades were the result of actual confusion between the parties as opposed to mere carelessness, mistake, or clerical error on a broker's part. *See First Keystone*, 923 F. Supp. at 706.   Indeed, it appears as if JPMorgan was the only financial institution that misdirected trades.   There is also no evidence to establish that three misdirected trades are significant, especially since the record is devoid of the number of trades that were executed without incident. *See* Note 19, *supra*; *Victoria's Secret*, 237 F.3d at 227 (finding a court may discount evidence of actual confusion that is "isolated and idiosyncratic").   The remaining allegations do present some evidence of actual confusion between the parties by broker-dealers.   But, again, the record does not convince the court that the few remaining alleged incidents translate to a more general likelihood of confusion as a matter of law, especially since the record is devoid of any inference of customer confusion.   Therefore, the court finds that this factor slightly favors the plaintiff.

### d.    Customer care and sophistication

---

[20] The plaintiff alleges that in Summer 2009, Citigroup delayed its application to acquire certain securities, in part, due to confusion between its account and another applicant, AAM, which inhibited the review and submission of both applications; and in August 2009, the plaintiff attempted to participate in a corporate bond offering through RBS, but was informed that it would not receive an allocation because it was mistaken for a hedge fund operating out of Colorado. (D.I. 48 at 8.)   In response, the defendants argue that the alleged confusion at Citigroup did not prejudice the plaintiff's application because it applied under the ARROWOOD name, and the plaintiff's applications were deferred because Citi gave preference to large orders and the plaintiff was one of the smallest participants. (D.I. 58 and 16.)   Similarly, the defendants argue that the plaintiff was able to resolve whatever error occurred in the 2009 RBS bond offering and it did get an allocation. (*Id.* at 15 n.6.)

"When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." *Checkpoint,* 269 F.3d at 284.

Here, the plaintiff concedes that "[c]ustomers of [the parties'] investment services are likely to be careful and sophisticated." (D.I. 48 at 13.) The defendants echo that premise and argue that customers of both parties invest large sums, usually at least $1 million, and investments in the defendants' hedge funds are "locked up" for 12 months, with penalties for early withdrawal. (D.I. 58 at 13-14.) Further, the defendants' potential customers are "high net worth individuals, institutional investors, or endowment funds" that often perform due diligence on the defendants before investing, (*id.*) and the plaintiff's potential customers are "insurance companies and pension funds," (D.I. 48 at 1). As such, the court finds that "the buyer class consists of sophisticated or professional purchasers" that "exercise heightened care in evaluating the relevant products before making purchasing decisions." *Checkpoint,* 269 F.3d at 284. Moreover, both parties acknowledge that they make individual, face-to-face presentations to potential investors, (*see id.* at 13; D.I. 48 at 14), which militates against a likelihood of confusion. Accordingly, this factor strongly favors the defendants due to the amount of money involved and the high level of customer sophistication.

### e.    Length of time the defendant has used the mark without evidence of actual confusion arising

The defendants contend that they began using their mark in December 2007 and the plaintiff's first alleged instance of actual confusion did not occur until more than a year later --

April 2009. (D.I. 58 at 14.) In contrast, the plaintiff asserts that the April 2009 confusion occurred less than one month after the defendants began investing in earnest under its Arrowpoint Opportunity Fund mark. (D.I. 48 at 13.) The court is unable to thoroughly assess this factor given the nature of the alleged "actual confusion," and the lack of evidence regarding the amount and type of trades the parties executed during the same timeframe. Therefore, this factor is neutral.

### f.      The defendants' intent in adopting the mark

"[E]vidence of intentional, willful and admitted adoption of a mark closely similar to the existing marks weighs strongly in favor of finding the likelihood of confusion." *Checkpoint,* 269 F.3d at 286 (citation and internal quotation marks omitted). Here, the defendants assert that "AAM selected its marks because arrowpoints had personal significance to [AAM's founder] and to suggest a connection between digging for arrowpoints and the thorough manner in which AAM conducts the fundamental research on which it bases its investment management services." (D.I. 58 at 3.) In addition they argue that AAM adopted its mark in good faith based on a clearance procedures that included counsel's review of a full U.S. availability trademark search report, which indicated that the plaintiff was engaged in property and casualty insurance, not investment management or related services. (*Id.*) As such, "[t]here is no evidence or even inference that [the] defendant[s] chose its name with [the] plaintiff's name or product in mind." *Checkpoint,* 269 F.3d at 286. Therefore, this factor favors the defendants.

### g.      Channels of trade and advertising media

"The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint,* 269 F.3d at 288-89 (citation omitted). Here, both parties promote their services through industry meetings, events, and direct presentations to prospective

clients. (*See* D.I. 48 at 2; D.I. 58 at 17.) However, the defendants target events of interest to hedge fund investors, family foundations, and endowments. (D.I. 58 at 17.) The plaintiff concedes that it does not attend such events "because it is not a hedge fund."[21] (D.I. 73 at 4.) Attendance at different sets of industry events cuts against a likelihood of confusion. *See Checkpoint,* 269 F.3d at 289. Further, the defendants rely on word-of-mouth referrals, (*id.* at 4), which intuitively eliminate the possibility of confusion. Finally, it cannot be over stressed that both parties use direct client presentations incorporating their respective logos, which are visually distinct. Thus, this factor strongly favors the defendants.

### h. Similarity of target customers & The relationship of the goods in the minds of customers

The parties generally seek distinct groups of customers that are sophisticated and unlikely to view the parties' services as related or similar. The plaintiff targets customers "experiencing some sort of financial distress," while the defendants pursue "high net worth individuals and institutional investors," not distressed companies. (D.I. 58 at 17-18.) The defendants do concede that insurance companies and pension funds are potential clients for both parties,[22] but they argue that those clients would retain the parties for different purposes -- the plaintiff's expertise is in fixed-income investments, while the defendants claim to "offer expertise across the capital spectrum." (*Id.*) In response, the plaintiff argues that any distinctions between the parties' services and clients are irrelevant given the overlap between their investment activity at

---

[21] The plaintiff does argue that the parties have attended the same industry events, which have resulted in "actual confusion." (D.I. 73 at 4.) The alleged "actual confusion" involved one of the plaintiff's employees, who was wearing an Arrowpoint Capital name badge, being asked whether he was associated with "Arrowpoint in Denver" by a person manning a trade booth. The court finds that such an encounter at a trade show does not affect its analysis of this factor.

[22] The plaintiff alleges that "the defendants have promoted their investment management services to at least eight insurance companies, four public pension plans, and three corporate pension plans." (D.I. 48 at 5.)

17

various brokerage firms, which has led to actual confusion. (D.I. 73 at 9.)  The court disagrees.

The distinctions between the parties' services and clients are the relevant inquiries under these two factors.  "[W]hen the parties target their sales efforts to the same group of consumers, there is a greater likelihood of confusion between the two marks."  *Sabinsa*, 609 F.3d at 188 (citation omitted).  However, "[i]f the products fall under the same general product category but operate in distinct niches, they will probably not be closely related."  *Id.* at 189 (citation and internal quotation marks omitted).  The court finds that, while some potential customers may overlap, there is little likelihood of customer confusion because the parties offer distinctly different investment management strategies to generally different classes of investors.

Further, any purported actual confusion by the broker dealers is not due to the *clients targeted* or the *investment management services* offered and should not be considered under these factors.  Rather, any broker-dealer confusion is attributable to the similarity of the marks and the fungible nature of commonly traded securities.  Stated differently, a particular fixed-income security is an identical "good" in the mind of a broker dealer regardless of what entity is purchasing it for *a particular client* based on *an individualized investment strategy*.  As such, any weight attributable to broker-dealer confusion is properly assessed by the "actual confusion" *Lapp* factor.  Therefore, the court finds that these factors favor the defendants.

### 3.    Lanham Act claims summary

The above analysis demonstrates that the balance of *Lapp* factors tips in favor of the defendants.  Importantly, the parties promote their specialized investment services using direct presentations to generally distinct groups of prospective customers, which include sophisticated or professional purchasers that invest large sums of money.  While similarities exist between the parties' word marks, the respective logos are distinct, and the overall strength of plaintiff's marks

18

is weakened by a lack of commercial strength. Further, the limited incidents of broker-dealer confusion are not dispositive of a likelihood of confusion in the marketplace, and do not outweigh the factors in the defendants' favor. Accordingly, the plaintiff has not shown a likelihood of confusion in the marketplace. Therefore, the plaintiff has not proven a likelihood of success on the merits for its Lanham Act claims.

### B. Likelihood of success on the merits - common law infringement and DTPA claims

Because the plaintiff failed to carry its burden for proving a likelihood of confusion, the court does not need to address the plaintiff's state law trademark claims at length. The plaintiff concedes in its opening brief that trademark infringement under the common law and DTPA are subject to the Lanham Act standard for trademark infringement. (D.I. 48 at 11.) In addition, the plaintiff relies upon its trademark infringement likelihood of confusion arguments to establish unfair competition and false advertising under the DTPA. Therefore, the court finds that the plaintiff has not proven a likelihood of success on the merits for its state law trademark claims.

### V. CONCLUSION

For the reasons stated above, the court will deny the plaintiff's motion for a preliminary and permanent injunction.

Dated: May **20**, 2014

_____
CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ARROWPOINT CAPITAL CORP.,                    )
                                             )
        Plaintiff,                           )
                                             )
    v.                                       )        Civil Action No. 10-161-GMS
                                             )
ARROWPOINT ASSET MANAGEMENT,                 )
LLC; ARROWPOINT PARTNERS GP, LLC;            )
ARROWPOINT PARTNERS GP2, LLC;                )
ARROWPOINT FUNDAMENTAL                       )
OPPORTUNITY FUND, LP; and                    )
ARROWPOINT STRUCTURED                        )
OPPORTUNITY FUND, LP,                        )
                                             )
        Defendants.                          )

**ORDER**

At Wilmington, this 20th day of May, 2014,

IT IS HEREBY ORDERED THAT Arrowpoint Capital Corp.'s Motion for a Preliminary and

Permanent Injunction (D.I. 4) is DENIED.

CHIEF, UNITED STATES DISTRICT JUDGE